UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| T.O., a minor through his Guardian Ad Litem Hannah Morris, Individually and as Personal Representative of the Estate of AMY WAYNE MORRIS, Deceased, et al.,<br><br>        Plaintiffs,<br>   v.<br>MICHAEL O'BRIEN,<br><br>        Defendant. | No. 2:24-cv-03243-DJC-CKD<br><br><br>ORDER |

      Plaintiffs T.O. and S.O., the minor children of Decedent Amy Wayne Morris, bring this action against Defendant Truckee Police Officer Michael O'Brien alleging that Defendant, while arresting Morris, advised Morris against disclosing her medical conditions and medications to jail staff which led to her eventual death in jail from acute ethanol withdrawal.  Plaintiffs bring four claims under the Fourth and Fourteenth Amendments stemming from Morris's arrest and untimely demise.  Defendant moves to dismiss Plaintiffs' claims, arguing they are insufficiently pled.

      Having reviewed the Parties' briefings and arguments, the Court agrees with Defendant that Plaintiffs have insufficiently stated their claims.  Accordingly, the Court will dismiss Plaintiffs' Complaint with leave to amend.

**BACKGROUND**

On the evening of January 15, 2023, Defendant and Truckee Police Officer Carlos Gomez were dispatched to Morris's home after Morris's fiancé, Cody Prout, called 911 to make a report that Morris had bitten him. (Compl. (ECF No. 1) ¶ 21.) When the officers arrived, they took turns interviewing Morris and Prout. (*Id.* ¶ 22.)

Morris informed the officers that Prout had tried to "get intimate" with her, but that she had refused. (*Id.* ¶ 23.) In response to Morris's refusal, Prout had pinned her to the bed and lain on top of her, refusing to release her from his restraint. (*Id.*) Accordingly, Morris, "fearing for the worse," bit his arm so that he would release her. (*Id.*) Prout, when interviewed, denied any disagreement concerning intimacy, instead stating he and Morris had a verbal argument that ended in her biting him. (*Id.* ¶ 23.) Prout also showed the officers a bruise from the bite. (*Id.* ¶ 24.) Defendant observed that the bruise appeared old, but Prout showed him a photo on his phone of the bruise when the bite had allegedly just happened. (*Id.*)

Officer Gomez asked Prout about Morris's medical conditions, to which Prout responded that Morris had "a lot of medical issues going on with her right now" such that he was "not sure she's always aware of exactly what's happening." (*Id.* ¶ 25.) Prout advised Officer Gomez that Morris suffered from a noticeable stutter due to a prefrontal cortex issue in her brain that needed to be treated with Gabapentin three times a day, otherwise she would lose her speech entirely. (*Id.*) Prout further advised that Morris was on several medications, including "Diazapene." (*Id.*) Plaintiffs allege there were numerous bottles of prescription medication in the living room and bedroom of the home, as well as an inhaler belonging to Morris, all of which would have placed the officers on notice that Morris had several existing medical conditions. (*Id.*) However, as Officer Gomez began writing down Morris's medications, Defendant allegedly shouted "Hey Carlos, I don't need all of her medication listed." (*Id.* ¶ 26.)

After taking down Prout and Morris's stories, Defendant informed Morris that she was under arrest for domestic violence. (*Id.* ¶ 28.) Morris was allegedly surprised

2

and tried to explain to Defendant that, while she had bitten Prout, she had only bitten him hard enough to be released from his restraint. (*Id.*) Defendant responded that someone had to go to jail, and that because Prout had produced evidence of an injury, Prout was deemed the victim and Morris the assailant. (*Id.*) However, Defendant told Morris that, because she had a self-defense claim, the District Attorney would likely throw the case out first thing in the morning. (*Id.*)

Plaintiffs allege that, during Morris's arrest, Defendant repeatedly told Morris to keep her medical conditions and medications to herself, as, if the jail was "aware of the full extent of her medical conditions and medication . . . they would have to transfer to Nevada city, in essence delaying her release from jail." (*Id.* ¶¶ 29–30.) For example, Morris asked if she could take two of her Gabapentin doses with her, relying on Defendant's assurance that she would be released in the morning. (*Id.* ¶ 30.) Defendant responded "I don't need to know that, you can tell the jail what you want, but if you're on a bunch of medication, they are going to make you go to Nevada City." (*Id.* ¶ 31.) Defendant then placed Morris in handcuffs and transported her to the Truckee jail. (*Id.* ¶ 32.) On the way, Defendant again told Morris "Don't get crazy on the medical questions when they ask you here, because they won't keep you," to which Morris replied "Oh, no I will not.  Thank you." (*Id.*)

Morris was not released from jail the next morning. (*Id.* ¶ 33.) Instead, she was transferred to the Wayne Brown Correctional Facility ("Facility") in Nevada city. (*Id.*) Morris did not have any of her medications or her inhaler with her. (*Id.*)

When Morris arrived at the Facility, a county correctional officer performed an initial health screening, during which the officer noted that Morris was a daily alcohol user, had been drinking in the last 24 hours, and was on Lorazepam daily. (*Id.* ¶ 36.) Plaintiffs allege that, "[a]s a result of Defendant O'Brien's instructions to Morris to downplay her medical conditions, there is no mention nor reference in the county Jail medical records of [Morris's] recent bouts of hospitalizations at the Tahoe Hospital for acute alcohol withdrawals, her history of withdrawal, her recent attempt at sobriety,

3

her chronic obstructive pulmonary disorder, history of chest pain, her history of low blood oxygen saturation, her episode of shortness of breath, difficulty breathing and hypoxia, a list of her current medication including Gabapentin and her breathing inhalers, [or] her pronounced stutter which likely would have been more noticeable without her medication." (*Id.* ¶ 37.)

After the correctional officer's initial screening, a nurse performed an additional intake medical screening. (*Id.* ¶ 38.) As part of that screening, the nurse inquired about Morris's history of alcohol use, the frequency of her use, and the date she last consumed alcohol. (*Id.*) Morris reported a history of daily alcohol use of 750 ml of vodka for greater than one year and stated her last date of usage was January 15, 2023. (*Id.* ¶ 39.) Plaintiffs allege that the level and frequency of Morris's alcohol consumption should have alerted the nurse that Morris was at high risk of suffering moderate to severe alcohol withdrawal. (*Id.* ¶ 40.) However, Plaintiffs allege the nurse incorrectly noted that Morris had no history of alcohol withdrawal and consequently under-assessed her risk for complications due to alcohol withdrawal. (*Id.* ¶ 41.) The nurse noted in the alerts section of Morris's chart that she was in "Active Withdrawal," but accepted Morris into the Facility and placed her into general population housing with minimal monitoring such that she would only be monitored every eight hours for five days. (*Id.* ¶¶ 42–43.)

Plaintiffs allege that Morris was examined by the Facility's nurses three times over the next two days, during which the nurses noted Morris was mildly anxious and had moderate tremors. (*Id.* ¶¶ 45–47.) On January 17, 2023, at approximately 8:00 AM, a nurse visited Morris to "dispense all her medications except Librium." (*Id.* ¶ 48.) The nurse indicated she would return within the hour with the Librium. (*Id.*) Plaintiffs allege there is no indication that the nurse performed any health assessment as Morris's "scoring sheet indicated scores of zero in every category and a total score of 'blank' meaning [Morris] would have exhibit[ed] no symptoms whatsoever of alcohol withdrawal approximately 33+ hours after she stopped drinking and an hour and

4

twenty minutes before she was found dead." (*Id.* ¶ 49.) However, "in light of her history of alcohol consumption and history of Gabapentin intake, [Morris] would have exhibited severe signs of both Gabapentin withdrawals combined with alcohol withdrawals when the nurse visited her which required her to immediately contact a provider or refer [Morris] via ambulance to the hospital." (*Id.*)

At approximately 9:09 AM, a correctional deputy performed a routine safety check and purportedly observed Morris in good health. (*Id.* ¶ 51.) Plaintiffs allege, however, that Morris was already in medical distress and the correctional officer failed to notice because a blanket was covering her face. (*Id.*) At approximately 9:18 AM, a nurse and correctional deputy went to Morris's cell door and repeatedly called her name. (*Id.* ¶ 52.) Morris did not respond. (*Id.*) The nurse and deputy then entered the cell and moved Morris's blanket revealing that her face was blueish. (*Id.*) Nurses performed CPR on Morris and called for an ambulance; Morris was transported to the hospital. (*Id.* ¶¶ 53–54.) Plaintiffs allege that Morris was suffering from cardiac arrest and pulmonary edema at that point, symptoms of which should have been noticeable during the welfare check conducted at 9:09 AM. (*Id.* ¶¶ 55–56.) Morris was pronounced dead at 10:28 AM. (*Id.* ¶ 57.) Morris's cause of death was deemed to be acute ethanol withdrawal. (*Id.* ¶ 61.)

Plaintiffs filed this action on November 20, 2024, bringing four causes of action for (1) state-created danger under the Fourteenth Amendment and 42 U.S.C. § 1983; (2) denial of medical care under the Fourth Amendment and 42 U.S.C. § 1983; (3) false detention and arrest under the Fourth Amendment and 42 U.S.C. § 1983; and (4) interference with familial relations under the Fourteenth Amendment and 42 U.S.C. § 1983.  Defendant moved to dismiss these claims on December 23, 2024, under Federal Rule of Civil Procedure 12(b)(6). (Mot. Dismiss (ECF No. 5).)  The Court held a hearing on March 6, 2025, with Jeffrey Mikel appearing for Plaintiffs, and Corey Wilson appearing for Defendant.  The matter was submitted.

////

**LEGAL STANDARD**

A party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The motion may be granted only if the complaint lacks a "cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). The court assumes all factual allegations are true and construes "them in the light most favorable to the nonmoving party." *Steinle v. City & Cnty. of San Francisco*, 919 F.3d 1154, 1160 (9th Cir. 2019). That said, if the complaint's allegations do not "plausibly give rise to an entitlement to relief" the motion must be granted. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A complaint need contain only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), not "detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). However, this rule demands more than unadorned accusations; "sufficient factual matter" must make the claim at least plausible. *Iqbal*, 556 U.S. at 678. In the same vein, conclusory or formulaic recitations of elements do not alone suffice. *Id*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

**DISCUSSION**

**I.      First Cause of Action for State-Created Danger under the Fourteenth Amendment and 42 U.S.C. § 1983**

Under the Fourteenth Amendment, the state deprives a person of a substantive due process right if it "affirmatively place[s] the plaintiff in a position of danger." *Wood v. Ostrander*, 879 F.2d 583, 589–90 (9th Cir. 1989) (quoting *Ketchum v. Cnty. of Alameda*, 811 F.2d 1243, 1247 (9th Cir. 1987)). To state a claim under the state-created danger doctrine, a plaintiff must show that: (1) the state actor's affirmative actions created or exposed them to "an actual, particularized danger" that they would not have otherwise faced, (2) the injury suffered was foreseeable, and (3) the state

actor was "deliberately indifferent" to the known danger. *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019).

"Section 1983 provides a cause of action against '[e]very person who, under color of' law deprives another of 'rights, privileges, or immunities secured by the Constitution.'" *Cornel v. Hawaii*, 37 F.4th 527, 531 (9th Cir. 2022) (quoting 42 U.S.C. § 1983) (alteration in original). A plaintiff must demonstrate that the defendant's conduct was the actionable cause of the claimed injury. *See Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008). "To meet this causation requirement, the plaintiff must establish both causation-in-fact and proximate causation." *Id.* (citation omitted). A defendant's conduct is a cause-in-fact or actual cause of a plaintiff's injury if it is a "but-for" cause of the injury. *See White v. Roper*, 901 F.2d 1501, 1505–06 (9th Cir.1990). And a defendant's conduct is a proximate or legal cause of a plaintiff's injury if there is "a sufficient causal link between the act or omission of a defendant and any injury suffered by the plaintiff to justify the imposition of liability." *Estate of Macias v. Lopez*, 42 F. Supp. 2d 957, 964 (N.D. Cal. 1999), *overruled on other grounds*, 219 F.3d 1018 (9th Cir. 2000). "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). A defendant may be liable under 42 U.S.C. § 1983 if he performs an affirmative act, participates in another's affirmative acts, or fails to perform an act which he is legally required to do that causes the plaintiff to suffer a deprivation of rights. *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

Plaintiffs allege that, by advising and instructing Morris to refrain from disclosing her medical conditions and medications to jail staff, Defendant placed Morris at risk that she would suffer "acute alcohol withdrawal, impending seizures, and delirium tremens, without the proper medical treatment." (Compl. ¶¶ 66–67.) Plaintiffs allege the absence of any reference to Morris's underlying medical

7

conditions and medications in the jail's medical records indicate Morris relied on Defendant's instructions not to disclose her medical needs to jail staff. (*Id.*)

Defendant argues Plaintiffs' claim must be dismissed because they fail to plausibly plead "any causal connection between [Defendant]'s alleged advisement to Morris to withhold information about her medical conditions and medication, and her eventual death from alcohol withdrawal in County custody." (Mot. Dismiss at 10.) Defendant points out that jail staff conducted a medical intake before Morris was admitted to the Facility, Morris disclosed that she typically imbibed 750 ml of vodka a day, and jail staff documented that Morris was a daily alcohol user who was in "Active Withdrawal." (*Id.* at 11.) Despite this, Defendant argues jail staff failed to adequately monitor Morris or provide necessary medical attention, resulting in her death from acute ethanol withdrawal. (*Id.*) Thus, Defendant argues that the "Complaint makes clear that substantial intervening factors were the actual and proximate cause of Morris['s] death, not [Defendant's] alleged advisement against disclosing her medical condition . . . ." (*Id.* at 12.)

The Court finds that Plaintiffs have failed to plausibly allege a causal connection between Defendant's advice that Morris should withhold her medical conditions and medications from jail staff and her death of acute ethanol withdrawal. Plaintiffs argue that Morris did not report the full extent of her medical conditions and medications to jail staff in reliance on Defendant's advice, which resulted in her receiving inadequate medical treatment at the facility. (Opp'n Mot. Dismiss (ECF No. 7) at 3–6.) Plaintiffs argue the Court may draw this conclusion because some of Morris's medical history and medications were missing from the Facility's medical records. (*Id.*) However, it is unclear to what extent Morris actually relied on Defendant's advice. Plaintiffs allege that both a correctional officer and nurse conducted medical intake screenings during which Morris informed jail staff she was a daily alcohol user, imbibed 750 ml of vodka a day, had been drinking in the last 24 hours, and was on Lorazepam daily. (Compl. ¶¶ 36–39.) Thus, Morris divulged certain critical health information to jail staff.

Indeed, Plaintiffs later allege that a nurse visited Morris on the day of her demise to "dispense *all* her medications except Librium," indicating Morris may have informed jail staff that she was on at least some medications and was receiving those medications while detained.[1] (*See id.* ¶ 48 (emphasis added).)

Critically, even if some medical information was missing from Morris's records, Plaintiffs do not allege how the outcome would have changed if jail staff knew the full extent of Morris's medical needs. Plaintiffs acknowledge that the level and frequency of Morris's alcohol consumption should have alerted the intake nurse that Morris was at high risk of suffering moderate to severe alcohol withdrawal, and that the nurse noted she was in "Active Withdrawal," but allege that the nurse "incorrectly noted that [Morris] had no history of alcohol withdrawals and consequently improperly under assessed her risk for complications related to alcohol withdrawal," thereafter placing her on an insufficient monitoring schedule. (*Id.* ¶¶ 40–44.) Plaintiffs also allege that a correctional deputy conducted an insufficient welfare check the morning of Morris's death, failing to notice she was suffering from cardiac arrest and pulmonary edema. (*Id.* ¶¶ 51, 55–56.) Thus, Plaintiffs allege that jail staff were clearly aware that Morris was at risk of alcohol withdrawal, but failed to properly monitor and care for her, resulting in her death from acute ethanol withdrawal. Based on these allegations, the Court finds that Plaintiffs have neither pled cause-in-fact nor proximate cause as Plaintiffs have not plausibly alleged Morris would have received better or different medical care had she disclosed the allegedly missing information in her medical file.

Plaintiffs argue that Defendant's Motion is improper as it asserts an affirmative defense of superseding cause, i.e., "that the subsequent actions of jail medical staff were a superseding cause of Decedent's death, and thus, Defendant is not liable." (Opp'n Mot. Dismiss at 5–6.) Ordinarily affirmative defenses may not be raised on a

---

[1] At oral argument, counsel for Plaintiffs indicated these medications were the ones prescribed by jail staff, not those that Morris had previously been taking. This issue should be clarified in an amended complaint. Similarly, if Morris suffered other harms while detained as a result of not receiving all her medications, Plaintiffs should make that clear in the amended complaint.

9

motion to dismiss. *United States CFTC v. Monex Credit Co.*, 931 F.3d 966, 972 (9th Cir. 2019). The doctrine of intervening or superseding cause is an affirmative defense. *See Park v. Kitt*, 1:19-cv-01551-AWI-HBK (PC), 2021 WL 1210364, at *5 (E.D. Cal. Mar. 31, 2021). Under California law, superseding cause is an intervening cause that breaks the chain of proximate causation. *See Chanda v. Fed. Home Loans Corp.*, 215 Cal. App. 4th 746, 755 (2013) ("The defense of superseding cause absolves the original tortfeasor, even though his conduct was a substantial contributing factor, when an independent event subsequently intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible."). However, an "allegation of an unforeseeable intervening or superseding cause is an affirmative defense that challenges causation and applies *only after* the plaintiff proves proximate causation." *Park,* 2021 WL 1210364, at *5 (emphasis added). As discussed above, Defendant argues, and the Court agrees, that Plaintiffs have not yet sufficiently pled a causal link between Defendant's actions and Morris's death. Thus, Defendant's Motion properly challenges the sufficiency of Plaintiffs' claim.

Thus, Plaintiffs' first cause of action will be dismissed with leave to amend.

## II.     Second Cause of Action for Denial of Medical Care under the Fourth Amendment and 42 U.S.C. § 1983

Post-arrest claims of denial of medical care during and immediately following arrest are analyzed under the Fourth Amendment and its "objective reasonableness" standard. *See Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1098–99 (9th Cir. 2006). "The Ninth Circuit has not prescribed the contours of what constitutes objectively reasonable post-arrest care." *Greene v. Bay Area Rapid Transit*, No. CV 21-00113-DMR, 2023 WL 2169497, at *12 (N.D. Cal. Jan. 18, 2023), *appeal dismissed*, No. 23-15241, 2023 WL 5352010 (9th Cir. May 15, 2023). At minimum, however, the Ninth Circuit has required police officers to "seek necessary medical attention" by "promptly summoning the necessary medical help or by taking the injured detainee to

a hospital." *Est. of Cornejo ex rel. Solis v. City of Los Angeles*, 618 F. App'x 917, 920 (9th Cir. 2015).  Whether an officer behaved reasonably and sufficiently promptly in rendering or summoning medical care for a detainee depends partly "on the length of the delay and the seriousness of the need for medical care."  *Holcomb v. Ramar*, No. 1:13-CV-1102 AWI SKO, 2013 WL 5947621, at *4 (E.D. Cal. Nov. 4, 2013)

Plaintiffs allege that Defendant violated Morris's right to post-arrest medical care by advising Morris not to disclose her medical conditions and medications to jail staff and by failing to request a medical clearance for her, resulting in her denial of adequate medical care and medication while in jail.  (Compl. ¶¶ 70–75.)   Defendant argues that Plaintiffs' claim should be dismissed as there is no evidence Defendant's statements or actions had any bearing on the care, or lack of care, Morris received while in jail, as Plaintiffs allege "Morris had reported her alcohol use history to medical personnel, County medical staff were caring for her, they were aware of her frequent and regular alcohol consumption, documented that she was in 'Active Withdrawal' during their care, and they gave Morris 'all her medications' except one" before she died of acute ethanol withdrawal.[2]  (Mot. Dismiss at 12–13.)

The Court will dismiss this claim.  First, it is unclear based on Plaintiffs' allegations that Morris was in medical distress either during or immediately following her arrest.  *Cf. Tatum*, 441 F.3d at 1099 (holding that "a police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment" where the arrestee's labored breathing after being handcuffed made it clear he was in distress).  Thus, Defendant cannot be faulted for failing to summon any immediate medical care while Morris was in his custody.  Second, as held in Section I *supra*, Plaintiffs have failed to plausibly plead Defendant's actions and

---

[2] Defendant also argues that, under *Gordon v. County of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018), Plaintiffs' claim arises under the Fourteenth, not Fourth, amendment, and should be dismissed on that basis. (Reply Mot. Dismiss (ECF No. 8) at 4-5.)  However, *Gordon* clarifies that claims for inadequate medical care by pretrial detainees arise under the Fourteenth Amendment.  Here, Plaintiffs challenge the denial of medical care immediately following Morris's arrest, which arises under the Fourth Amendment.  *Tatum*, 441 F.3d at 1098-99.

11

advice caused Morris's inadequate medical treatment and subsequent death in jail because Plaintiffs' allegations demonstrate jail staff were aware Morris required certain medications and was in active alcohol withdrawal, but failed to properly monitor her, leading to her untimely demise.

Thus, Plaintiffs' second cause of action will be dismissed with leave to amend.

### III. Third Cause of Action for False Detention and Arrest under the Fourth Amendment and 42 U.S.C. § 1983

The Fourth Amendment prohibits unreasonable searches and seizures by law enforcement officials. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). Under the Fourth Amendment, law enforcement officers must have probable cause to make an arrest if they do not have an arrest warrant. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). "[A]n arrest without probable cause violates the Fourth Amendment and gives rise to a claim for damages under [section] 1983." *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 (9th Cir. 2011) (citation and quotation marks omitted); *see Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998) (per curiam) (to prevail on section 1983 claim for false arrest/false imprisonment, plaintiff must demonstrate there was no probable cause to arrest him). "A police officer has probable cause to effect an arrest if 'at the moment the arrest was made . . . the facts and circumstances within [his] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that the suspect had violated a criminal law." *Orin v. Barclay*, 272 F.3d 1207, 1218 (9th Cir. 2001) (quoting *Beck*, 379 U.S. at 91), *cert. denied*, 536 U.S. 958 (2002).

Plaintiffs allege Defendant lacked probable case when he arrested Morris for domestic violence because Morris claimed she was acting in self-defense, Prout presented "questionable" evidence of any injury, and Defendant told Morris he believed the district attorney would likely drop the charges. (Compl. ¶¶ 78–80.) Defendant argues, however, there was ample probable cause for "Morris's arrest for domestic violence pursuant to Penal Code §§ 240, 242 and 836(d)" because Morris's

fiancé Prout had called 911 to report domestic violence, when Defendant and Officer Gomez arrived to investigate that claim Morris admitted she bit Prout, and Prout showed Defendant a bruise from the bite.  (Mot. Dismiss at 15–16.)

The Court finds the arrest was supported by probable cause.  Probable cause "is not a high bar[.]"  *Kaley v. United States*, 571 U.S. 320, 338 (2014).  Rather, probable cause requires only a "fair probability" that the defendant committed a crime.  *Grant*, 315 F.3d at 1085.  Even if some evidence is disputed or conflicting, that does not preclude a conclusion that "probable cause" exists.  *See Lassiter v. City of Bremerton*, 556 F.3d 1049, 1053 (9th Cir. 2009).  California Penal Code section 836(d) provides, in relevant part, "if a suspect commits an assault or battery upon a current or former spouse, fiancé, fiancée, a current or former cohabitant . . . a peace officer may arrest the suspect without a warrant where . . . [the] peace officer has probable cause to believe that the person to be arrested has committed the assault or battery, whether or not it has in fact been committed."  Here, Morris admitted she bit Prout without his consent as a result of a domestic dispute and Prout provided evidence that he sustained an injury as a result of the bite.  Based on these facts, Defendant had ample basis to conclude there was a "fair probability" Morris committed an assault and/or battery on her fiancé.  That Morris and Prout had different versions of events, or that Morris may have been acting in self-defense, does not undermine this probable cause analysis.

Thus, Plaintiffs' third cause of action will be dismissed with leave to amend.

**IV.   Fourth Cause of Action for Interference with Familial Relations under the Fourteenth Amendment and 42 U.S.C. § 1983**

The Fourteenth Amendment provides parents and children a liberty interest in each other's "companionship and society."  *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010); *see also Hardwick v. Cnty. of Orange*, 980 F.3d 733, 740–41 (9th Cir. 2020) (holding the Fourteenth Amendment's guarantee against unwarranted state interference with the right to familial association applies equally to "parent-child"

relationships and "child-parent" relationships). Official conduct that "shocks the conscience" in depriving a parent or child of that interest "is cognizable as a violation of due process." *Wilkinson*, 610 F.3d at 554.

Plaintiffs, Morris's children, claim they were deprived of their familial relationship with Morris because of Defendant's actions. (Compl. ¶¶ 84-90.) However, the Court will dismiss this claim for the same reasons stated in Section I *supra*—Plaintiffs have failed to plausibly plead any causal connection under section 1983 between the advice Defendant allegedly gave to Morris to withhold her medical information from jail staff and Morris's subsequent death in detention.

Thus, Plaintiffs' fourth cause of action will be dismissed with leave to amend.

## CONCLUSION

In accordance with the above, it is HEREBY ORDERED Defendant's Motion to Dismiss (ECF No. 5) is GRANTED. Plaintiffs' Complaint (ECF No. 1) is DISMISSED with leave to amend. Plaintiffs are granted thirty (30) days to file an amended complaint.

IT IS SO ORDERED.

Dated: **March 7, 2025**

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE

DJC4 – OBrien24cv3243.MTD